**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America, | No. CR-21-00355-001-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Mick J. Careaga, | |
| Defendant. | |

Pending before the Court are a pair of post-trial motions filed by Defendant Mick Careaga ("Defendant"). (Docs. 109, 110.) For the following reasons, both motions are denied.

**RELEVANT BACKGROUND**

I.    The Government's Theory

On May 11, 2021, the grand jury returned an indictment charging Defendant with one count of first-degree murder (Count One), one count of discharge of a firearm during and in relation to a crime of violence resulting in death (Count Two), one count of assault with a dangerous weapon (Count Three), and one count of brandishing a firearm during and in relation to a crime of violence (Count Four). (Doc. 1.)

During closing argument at trial, the government set forth its theory of the events giving rise to those charges. (Doc. 104 at 43-54.) The government's theory was as follows. On November 14, 2020, Defendant was drinking with a long-time acquaintance named Ruben Contreras ("Contreras") but then dropped off Contreras at a casino so Defendant

could attempt to meet with an unidentified woman for a sexual liaison.  (*Id.* at 43-45.)
Contreras, upon being dropped off at the casino, took an Uber back to the Salt River-Pima
Maricopa Indian Community ("SRPMIC"), where he lived in a small trailer he shared with
his sister, Nancy Rhoades ("Rhoades").  (*Id.*)  When Contreras arrived at the trailer,
Rhoades was being visited by a friend named Sara Smith ("Smith").  (*Id.*)

Soon after Contreras arrived at the trailer, Defendant also drove up to the trailer.
(*Id.* at 45.)  After getting out of his car, Defendant had a brief verbal disagreement with
Smith about an unspecified topic, then left.  (*Id.* ["[T]here was something that [Smith] and
the defendant had conversed for a period of time.  And I'll leave you to recall the exact
words, something to the effect, I don't want to hear that S-H-I-T, I don't want to hear that
S-H-I-T."].)  Afterward, Smith went inside the trailer.  (*Id.* at 46.)  Contreras also went into
the trailer, where he smoked marijuana.  (*Id.*)  Rhoades was also inside the trailer, playing
a game on her cellphone.  (*Id.*)  Rhoades is a double-leg amputee who ordinarily uses a
wheelchair, but due to the small size of the trailer, Rhoades left the wheelchair outside.
(*Id.* at 43-44.)

Some time later, while Contreras, Smith, and Rhoades were still inside the trailer,
Defendant returned.  (*Id.* at 46.)  Defendant opened the door, came inside briefly, left, then
came inside a second time and locked the door.  (*Id.*)  Defendant was shirtless, wearing
gloves, and holding a gun.  (*Id.*)  As Smith rose to stand up, Defendant shot fatally shot her
in the head at close range.  (*Id.* at 46-47.)  Almost immediately afterward, Contreras tackled
Defendant and the pair went to the ground.  (*Id.* at 47-48.)

During the ensuing fracas, Defendant pointed the gun at Contreras while Rhoades
called 911.  (*Id.* at 48-49.)  During the 911 call, Rhoades identified Defendant by name as
the assailant and pleaded for assistance as the sounds of the struggle could be heard in the
background.  (*Id.  See also* Doc. 46-3 at 5 [transcript of 911 call: "my brother's got 'em,
Mick Careaga"].)

The force of the struggle between Contreras and Defendant caused an opening to
form on the wall/floor of the trailer.  (Doc. 104 at 49.)  Defendant crawled through this

opening in an attempt to flee but scraped himself on the trailer's surface in the process, leaving behind his DNA.  (*Id.* at 49-51.)   Law enforcement officers eventually found Defendant in the general vicinity of the trailer.  (*Id.* at 50.)  Defendant's pants and shoes had blood on them, and DNA testing showed that the blood was Smith's.  (*Id.* at 50-53.)

Based on the foregoing, the government's theory was that Defendant murdered Smith with premeditation (Count One) and discharged a firearm during and in relation that crime, resulting in Smith's death (Count Two), then separately assaulted Contreras with dangerous weapon (Count Three) and brandished a firearm during and in relation to that crime (Count Four).

II.    The Defense Theory And Strategy

In light of DNA evidence, the 911 call, and the location and timing of his arrest (all of which strongly suggested that he had been inside the trailer and had been near Smith when she was shot), Defendant understandably did not attempt to pursue some sort of alibi or mistaken-identity defense at trial.   Instead, the defense advanced the theory that Contreras had, while inside the trailer, "lunged" at Defendant in a "rage."  (Doc. 104 at 57. *See also id.* ["Ruben's anger fueled him to go after Mick.  That makes more sense than Ruben being heroic."].)[1]  The defense's theory was that this lunge caused a gun to discharge accidentally, and the bullet tragically hit and killed Smith.  (*Id.* at 55 ["No one intended to shoot Sara Smith that day, no one intended to shoot her.  Mick Careaga had no motive."].) The defense further argued that, once Contreras realized what had occurred, he instructed his sister, Rhoades, to call 911 and falsely blame the shooting on Careaga.  (*Id.* at 57-59.) In closing, defense counsel argued that the evidence of these coaching efforts could be heard in the background of the 911 call.  (*Id.* ["On the call Nancy Rhoades again says, I think he shot our friend. . . .  It was after Ruben had gone from the trailer and came back is when he says, you could hear it, he shot her in the head.  Tell them, sister, he shot her.  To make sure that the story already had started.  Because he says it again.  Tell them he shot

---

[1]     Because Defendant chose not to testify, this alternative theory was pursued through the argument of defense counsel.

her.  That information isn't necessary.  They already know someone's been shot, that's been clear.  So why at this point into the call is he now starting to say, tell them he shot her?"].)

A key component of the defense's strategy at trial was to impeach Contreras and Rhoades, who were the only witnesses who offered first-hand accounts of the incident, and to elicit testimony from those witnesses that was consistent with the defense's theory.  (*See, e.g.*, *id.* at 59 ["Well, maybe these two were able to bamboozle some, but it's clear those two are not to be trusted.  Both have multiple felonies."].)  And in both regards, the defense achieved some success.  During his direct examination, Contreras admitted that he has four felony convictions and previously spent more than six years in prison.  (Doc. 112 at 44.)  Contreras also admitted that he wasn't "particularly happy" with Defendant on the day of the shooting, as a result of being forced to take an Uber home from the casino, and told Defendant "that's some fucked up punk ass shit" when Defendant first returned to the trailer.  (*Id.* at 60.)  Additionally, at one point during his direct examination, Contreras offered a profane and non-responsive criticism of Defendant's conduct in relation to the shooting.  (*Id.* at 72 ["That's when I realized, what the fuck is this punk ass mother fucker going to do, man?  He going take us all out or what?  It's bullshit, man.  Chicken shit stuff, man.  Especially to a woman, your own cousin, man.  It's fucked up.  A girl, too. . . . This is bullshit."].)  In response, the Court had to instruct Contreras to only answer the questions being posed to him.  (*Id.* at 72, 74.)  The following morning, the Court instructed the jury to disregard Contreras's non-responsive statements.  (Doc. 113 at 17-18.)[2]  During cross-examination, Contreras further admitted that he was "mad" at Defendant on the day of the shooting (*id.* at 27); that he had previously denied being mad when questioned by the police (*id.* at 27-28); that the first thing he did after returning to the trailer, following the shooting,

---

[2]      Although Court stated "I instructed [you to] disregard those statements . . . [a]nd they were stricken" (Doc. 113 at 18), it does not appear that the Court actually instructed the jury to disregard the statements at the close of the previous day's proceedings on May 9.  Nevertheless, because the Court made clear that the statements should prospectively be considered stricken and disregarded ("I just want to reiterate that now"), the instruction on the morning of May 10 achieved the same result.

was to ask Rhoades about the drugs in her pocket (*id.* at 34-35); that he had committed an assault in 2021 by hitting another man with a two-by-four, causing the other man to be hospitalized (*id.* at 43); and that two of his prior convictions were for making false statements to a police officer (*id.* at 50-51).

Meanwhile, Rhoades admitted during her direct examination that she has a prior felony conviction for car theft (*id.* at 54-55); that she was a long-time user of methamphetamine and fentanyl (*id.* at 55-56); and that she did not actually see the gunshot that killed Smith, because she was playing a game on her cell phone at the time (*id.* at 63). During cross-examination, Rhoades further admitted that she has two additional felony convictions (forgery and drug use) which she had failed to mention during direct examination. (*Id.* at 75.) Finally, Rhoades acknowledged that she previously told a police detective that she heard two gunshots during the incident. (*Id.* at 82-84.)

III.   Jury Instructions

Before trial, the parties jointly filed their requested jury instructions. (Doc. 42.) In relation to Count One, both sides requested the Ninth Circuit's standard instruction on first-degree murder and the government also requested (over the defense's objection) the Ninth Circuit's standard instruction on lesser-included offenses and the Ninth Circuit's standard instruction on second-degree murder. (*Id.* at 4.) In relation to Count Three, both sides requested the Ninth Circuit's standard instruction on assault with a dangerous weapon. (*Id.* at 5.) Neither side requested any lesser-included instructions in relation to Count Three.

The charge conference took place on the afternoon of May 11, 2022, immediately after the close of evidence. (Doc. 103 at 146-73.) Defendant was personally present in the courtroom throughout the charge conference and did not voice any objections to his counsel's approach during the conference. (Doc. 63 [Defendant was present and in custody].) Additionally, immediately before the charge conference began, the Court had defense counsel confirm on the record that Defendant had made a knowing decision, after consultation with counsel, not to testify. (Doc. 103 at 145.) The Court noted for the record that "I see Mr. Careaga nodding his head in agreement with the statement by [defense

counsel]." (*Id.* at 145-46.)

During the charge conference, the Court began by addressing the government's request for an instruction on the lesser-included offense of second-degree murder. (*Id.* at 148.) Defense counsel did not identify any factual reason why the instruction was improper and objected only on notice grounds. (*Id.*) The government argued that an instruction on second-degree murder was appropriate because "the jury could find that there was insufficient time after the defendant formed the intent to kill to premeditate and deliberate with regard to the commission of the murder first degree, but there was still evidence of malice aforethought that this defendant deliberately and intentionally committed this act." (*Id.*) The Court agreed with the government's position and agreed to give a second-degree murder instruction. (*Id.* at 152.)

During this discussion, defense counsel orally requested a further lesser-included instruction on involuntary manslaughter. (*Id.* at 148 ["Judge, . . . I'm going to ask for a lesser included as well, and that would be involuntary man[slaughter]."].) When asked why this request hadn't been included in the parties' pretrial filing, defense counsel initially stated that "it was just dilatory actions on my part" before stating that "I had to see how the evidence did actually play out." (*Id.* at 155.) On the merits, the government opposed the request by arguing that, in light of the testimony of Contreras and Rhoades and the forensic evidence (which showed that the fatal shot occurred at close range), the jury could only find "that this was an intentional act." (*Id.* at 149-50.) Defense counsel disagreed: "[T]here is sufficient evidence in my opinion, based on Nancy Rhoades' testimony, that the fighting may have already occurred when that shot went off. And so if that's the case, if the shot is going off while two other people are rumbling, I do believe that that can show reckless or negligence at the time." (*Id.* at 151.) Later, defense counsel added: "[A]ll we're doing is just taking it further down the scale on the mens rea at this point. The actus reus is still the same. There was a homicide, somebody died, and there was causation." (*Id.* at 153-54.) Defense counsel also argued: "We have heard from [Contreras] that he was mad, he was hot. And at that point we're in a very small trailer, and so what we have is [Contreras]

towards the back of the trailer.  And we know where [Smith] was sitting, toward the front of that trailer.  So if [Contreras] is now all of a sudden bull charging, he's running past [Smith] to go after [Defendant], and they may rumble.  And we're saying at that point the gunshot could have gone off after that rumble when he was rushed.  It's still consistent with the location that the medical examiner says.  And we're not saying it was two shots, we're actually saying it was only the shot after.  And if you need more, I can point out what we believe about [Contreras's] statements.  [Contreras's] statements are far from credible." (*Id.* at 157.)

The Court was ultimately persuaded by defense counsel's arguments and agreed to give the Ninth Circuit's model instruction on involuntary manslaughter.  (*Id.* at 157-58.)  Although the Court did so "with some pause, because . . . this is a very close call on whether a jury could rationally do this," the Court emphasized that "there's a significant risk to not giving an instruction on a defense theory in a case that's even arguable.  So I think that prudence counsels in favor of giving the instruction here."  (*Id.*)

Defense counsel then asked the Court to give another lesser-included offense instruction that was not mentioned in the parties' pretrial filing.  This request related to Count Three, which charged Defendant with the crime of assault with a dangerous weapon.  Defense counsel requested an instruction on the lesser-included offense of simple assault. (*Id.* at 158.)  Defense counsel's argument in favor of this instruction was that "reasonable minds can differ [on] whether a gun was actually pointed at [Contreras] at any time during this" and "anything that [Contreras] says could be disregarded by the jury with regards to an essential element of the aggravated assault, thereby giving them the opportunity to come up with simple assault."  (*Id.* at 158-59.)  The Court agreed with defense's counsel's argument and agreed to give the lesser-included instruction: "Although it's a very close call, I do think that a jury rationally could find that this was simple assault rather than assault with a deadly weapon due to some of the imprecision in the witness testimony, that . . . viewed in the light most favorable to the defendant, could be the assault occurring without a gun. . . .  [E]ven though there's a strong argument that the defense has forfeited

its right to request these instructions by not including them in the packet instructions, I am going to decline to apply strictly the forfeiture rules here and give this instruction." (*Id.* at 163.)

The following morning, May 12, 2022, the Court spoke with counsel outside the jury's presence to finalize the jury instructions before closing arguments. (Doc. 104 at 4-13.) Defendant was personally present in the courtroom throughout this discussion and did not voice any objections to his counsel's approach during the discussion. (*Id.*) Among other things, the Court noted during this discussion that the Ninth Circuit's model jury instruction on lesser-included offenses, Model Instruction 6.14, gives the defendant "the right to elect whether all or only some of the jurors must not be convinced beyond a reasonable doubt of the guilt of the greater offense" before considering the lesser offense. (*Id.* at 5.) Thus, the Court asked defense counsel to specify how the defense would like to proceed. (*Id.* at 6.) In response, defense counsel requested some time to think about it. (*Id.* at 6.) The Court granted this request. (*Id.* at 7.) Several minutes later, defense counsel made the election, specifying that the jury instruction should use the word "all" rather than "any." (*Id.* at 12-13.)[3]

IV.     Jury Deliberations And Verdict

While deliberating on May 13, 2022, the jurors asked several questions. First, the jurors asked for a transcript of the 911 call. (Doc. 68 at 2.) At approximately 9:45 am, the transcript was provided. (*Id.*)

Next, one juror asked: "Does murder in the 2nd Degree require <u>intent</u> to kill/harm?" (*Id.* at 3.) At approximately 12:45 pm, the Court answered this question by referring the jury to the second-degree murder instruction's definition of malice aforethought. (*Id.*)

Next, one juror wrote: "The jury is split on a decision between 2 charges for Count

---

[3]     The transcript shows that the Court granted the request for more time around the time stamp "00:44:59" (Doc. 104 at 7), that counsel initially made the election around the time stamp "00:52:26" (*id.* at 12), and that counsel reconfirmed this election, after some further deliberation, around the time stamp "00:53:51" (*id.* at 13). Again, Defendant was sitting next to defense counsel throughout this period and never interjected or expressed disagreement with counsel's approach.

1.  What are our options?" (*Id.* at 4.)  At approximately 2:30 pm, the Court answered this question by referring to the jury instructions specifying how to choose between greater and lesser-included offenses. (*Id.* at 5.)

Next, one juror wrote: "Are all blanks on verdict form to be completed, even if an answer is not required?  Ex. One charge <u>or</u> another (lesser) charge.  Is N/A applicable?" (*Id.* at 6.)  At approximately 3:20 pm, the Court answered this question by writing: "A blank need not be completed if an answer is not required." (*Id.*)[4]

Soon afterward, the jury announced that it had reached a verdict.  At 3:51 pm, the jury and the parties assembled in the courtroom for the reading of the verdict.  However, when the court reviewed the verdict form, it noticed that the jury had failed to provide any verdict in response to Count Two.  During a discussion at sidebar, both sides agreed with the Court's suggestion to instruct the jury to return to the jury room to complete its deliberations: "Ladies and gentlemen, the reason I've taken a moment is in reviewing the verdict form I see that Count 2 is not completed, and so what I'm going to have you to do is go back to the jury room and complete your deliberations with respect to Count 2.  So I will hand the verdict form back to the bailiff.  The bailiff will return it to the foreperson."[5]

Soon afterward, the jury again announced that it had reached a verdict.  At 4:12 pm, the jury and the parties again assembled in the courtroom.  As reflected in the verdict form (Doc. 66), as for Count One, the jury found Defendant not guilty of first-degree murder, not guilty of the lesser-included offense of second-degree murder, and guilty of the further lesser-included offense of involuntary manslaughter.  (*Id.* at 2.)  As for Count Two, the jury found Defendant not guilty of discharging a firearm during and in relation to a crime

---

[4]     Ironically, as it turns out, during the discussion about how to answer this question, the government's counsel initially suggested that the jury be required to fill out every blank, regardless of the jury's answers in the other blanks.  In response, the Court discouraged this approach because it might lead to an inconsistent verdict if the jury returned a guilty verdict on a greater count but a not-guilty verdict on a lesser count.  Afterward, the government's counsel and defense counsel both agreed that the jury should be told not to complete blanks for which an answer was not required.  This discussion is reflected in the rough transcript from the proceedings on May 13, 2022, which the parties have not ordered but which the Court reviewed for the purpose of resolving Defendant's post-trial motions.

[5]     These details are reflected in the rough transcript from the proceedings on May 13, 2022.

1    of violence resulting in death.  (*Id.* at 3.)[6]  As for Count Three, the jury found Defendant

2    guilty of assault with a dangerous weapon and not guilty of the lesser-included offense of

3    simple assault.  (*Id.*)  As for Count Four, the jury found Defendant guilty of brandishing a

4    firearm during and in relation to a crime of violence.  (*Id.*)[7]

5    V.    Post-Trial Proceedings

6         On September 15, 2022—more than four months after the verdict—defense counsel

7    filed a motion to determine counsel.  (Doc. 86.)  It explained that that "based on the last

8    conversation with [Defendant], undersigned counsel believes that a hearing to determine

9    counsel would be appropriate and necessary to protect [Defendant's] interest."  (*Id.*)

10        On September 19, 2022, following a hearing, the Court granted the motion and

11   appointed new counsel to represent Defendant.  (Doc. 88.)  Successor counsel thereafter

12   sought and obtained several continuances in order "to complete the motions [Defendant]

13   has requested of him."  (Doc. 107.)

14        On March 13 and 14, 2023, successor counsel filed the motions pending before the

15   Court.  (Docs. 109, 110.)  The motions are now fully briefed.  (Docs. 114-17.)

16        On April 6, 2023, the Court issued a tentative ruling.  (Doc. 121.)

17        On April 10, 2023, the Court heard oral argument.

**ANALYSIS**

19   I.    Counts Three And Four

20        A.    **The Parties' Arguments**

21        In the first pending motion, Defendant moves to dismiss Counts Three and Four.

22   (Doc. 109.)  The basis for this request is the jury's verdict on Count Three, in which

23   Defendant was found guilty of the charged offense of assault with a dangerous weapon but

---

[6]    This outcome was dictated by the verdict on Count One.  The verdict form specified, in relation to Count Two, that "[t]he Crime of Violence Resulting in Death must be either CIR-Murder First Degree or CIR-Murder Second Degree."  (*Id.* at 3.)

[7]    The rough transcript from the proceedings on May 13, 2022 reflects that, when reading the verdict on Count Three, the clerk only read the guilty verdict as to the offense of assault with a dangerous weapon and did not read the not-guilty verdict as to the lesser-included offense of simple assault.  The Court regrets not noticing this oversight at the time, although for the reasons discussed *infra*, it had no bearing on the outcome here.

not guilty of the lesser-included offense of simple assault.  (Doc. 66 at 3.)  According to Defendant, "[i]f the simple assault is an element of the assault with a dangerous weapon, which it is, then finding [Defendant] 'Not Guilty' of that element leads inescapably to the conclusion that he is also, as a matter of law, not guilty of the Assault with a Dangerous Weapon."  (*Id.* at 4.)  Defendant argues that, under *United States v. Pierce*, 940 F.3d 817 (2d Cir. 2019), *United States v. Randolph*, 794 F.3d 602 (6th Cir. 2015), and *United States v. Shippley*, 690 F.3d 1192 (10th Cir. 2012), the only way to address these "irreconcilable inconsistencies"—or, at least, the only way to do so where, as here, the jury has already been discharged—is to order acquittal on both counts.  (*Id.* at 4-7.)  Finally, Defendant argues that if the guilty verdict on Count Three is nullified, the guilty verdict on Count Four must be nullified, too, because there is no longer any predicate crime-of-violence conviction.  (*Id.* at 7-8.)

The government opposes Defendant's motion.  (Doc. 114.)  The government invokes "[t]he requirement that a court search for any reasonable way to reconcile a jury's verdict" and "[t]he principle that courts should attempt to first reconcile seemingly-inconsistent verdicts before vacatur."  (*Id.* at 6.)  The government argues that reconciliation is possible here because (1) the jury specifically found Defendant guilty of assault with a dangerous weapon; (2) the Court already implicitly found, via the denial of Defendant's motion for a directed verdict, that there is sufficient evidence to support a guilty verdict on that charge; (3) under the jury instructions, the jury should not have even returned a verdict as to the lesser-included offense of simple assault in light of the guilty verdict on the greater count; (4) the jury expressed seeming confusion over the necessity of returning a verdict as to simple assault via its last jury question; and (5) the jury specifically found Defendant guilty of Count Four, which required a finding of guilt as to the charge of assault with a dangerous weapon in Count Three.  (*Id.* at 8-9.)  The government also identifies various reasons why *Pierce*, *Randolph*, and *Shippley* should be viewed as distinguishable.  (*Id.* at 8.)[8]

---

[8]      In a footnote, the government acknowledges that if the Court were to vacate the guilty verdict as to assault with a dangerous weapon, this would also require the vacatur of

1    In reply, Defendant argues that the cases cited by the government are distinguishable

2    because "[t]he inconsistency here is on the same count, on the same verdict form, and

3    against the only defendant in this trial.  That fact sets this case apart from those relied upon

4    by the government."  (Doc. 116 at 2.)  In contrast, Defendant notes that his cited cases

5    "involved (as here) inconsistencies within the same count."  (*Id.* at 5.)  Defendant concludes

6    that the government's attempts to harmonize the verdicts on Count Three "is really just the

7    government saying 'honor the one verdict (which we like) but ignore the other.'  All of the

8    cases examining these internally inconsistent verdicts hold otherwise."  (*Id.* at 6.)

9        B.    **Discussion**

10       Although Defendant's challenge to the guilty verdicts on Counts Three and Four is

11   not frivolous and presents somewhat novel issues, the Court concludes that Defendant is

12   not entitled to relief.  Defendant seeks to rely on cases from outside the Ninth Circuit in

13   support of his contention that the Court must attempt to reconcile the seemingly

14   inconsistent verdicts on Count Three (and, if reconciliation is impossible, must enter a

15   judgment of acquittal in his favor), but the Ninth Circuit has never endorsed such an

16   approach.  To the contrary, the rule in the Ninth Circuit is that "[w]e need not reconcile

17   rationally inconsistent verdicts, nor do inconsistent verdicts mandate reversal.  We need

18   determine only whether there was sufficient evidence upon which the guilty verdict can be

19   sustained."  *United States v. McCall*, 592 F.2d 1066, 1068 (9th Cir. 1979).  *See also id.*

20   ("The appeal . . . is based on the mistaken assumption that this court should reconcile

21   arguably inconsistent verdicts, and speculate as to the reasons for the jury's not guilty

22   verdict on [some] counts."); *United States v. Guzman*, 849 F.2d 447, 448-49 (9th Cir. 1988)

23   ("Even if the verdicts were inconsistent, that would not require reversal.  Inconsistent

24   verdicts may stand, even when a conviction is rationally incompatible with an acquittal,

25   provided there is sufficient evidence to support a guilty verdict.") (citation and internal

26   quotation marks omitted); *Gaylor v. United States*, 426 F.2d 233, 235 (9th Cir. 1970)

27   ("Appellant's final contention is that her motion for a judgment of acquittal should have

28   _____

     the guilty verdict on Count Four.  (*Id.* at 10 n.2)

- 12 -

1  been granted because the verdicts were inconsistent.  Even though a jury's conflicting

2  conclusions cannot be reconciled, the conviction is not improper.").

3          For example, in *United States v. Hart*, 963 F.2d 1278 (9th Cir. 1992), the defendant

4  was acquitted of distributing or aiding and abetting the distribution of cocaine but convicted

5  of conspiring to distribute cocaine.  *Id.* at 1280.  Following trial, the defendant moved for

6  a judgment of acquittal in light of the inconsistency in the jury's verdicts.  *Id.*  The district

7  court granted the defendant's motion but the Ninth Circuit reversed and reinstated the

8  conspiracy conviction, holding that even though "there could be an inconsistency," the

9  existence of an inconsistency would not mandate reversal.  *Id.* at 1280-81.  "[E]ven if we

10 . . . discovered a true inconsistency, . . . the inconsistency cannot be considered."  *Id.* at

11 1282.

12         The *Hart* court also summarized the history behind declining to review jury verdicts

13 for inconsistency.  The court noted that, in *Dunn v. United States*, 284 U.S. 390 (1932), the

14 Supreme Court recognized the general principle that "[c]onsistency in the verdict is not

15 necessary."  *Id.*  at 1281.  The court further noted that, in *Dunn*'s aftermath, "a number of

16 circuits . . . including ours" attempted to create various exceptions to *Dunn*'s "general rule,"

17 but the Supreme Court "disagreed" with that trend in *United States v. Powell*, 469 U.S. 57

18 (1984), holding "that the arguments for exceptions to the *Dunn* rule were imprudent and

19 unworkable" and again concluding "that the best course to take is simply to insulate jury

20 verdicts from review on this ground."  *Id.*  The court also noted that, in *Powell*, the Supreme

21 Court recognized that "[i]nconsistent verdicts—even verdicts that acquit on a predicate

22 offense while convicting on the compound offense—should not necessarily be interpreted

23 as a windfall to the Government at the defendant's expense.  It is equally possible that the

24 jury, convinced of guilt, properly reached its conclusion on the compound offense, and

25 then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the

26 lesser offense."  *Id.* (citation omitted).  The court thus concluded that it saw "no reason to

27 engage in [the] interesting intellectual exercise" of trying to decipher whether the verdicts

28 could be harmonized.  *Id.* at 1282.

Here, too, even if the jury's verdicts on Count Three could be viewed as inconsistent with each other, it doesn't follow that the guilty verdict on the charge of assault with a dangerous weapon must be vacated. The evidence was legally sufficient to support a conviction on that charge—Contreras's and Rhoades's testimony, if believed by the jury, shows that Defendant assaulted Contreras with a firearm during the fracas following the shooting—and it is not this Court's role, at least under Ninth Circuit law, to hypothesize whether the jury's guilty verdict on that charge was mistaken in light of the jury's other verdicts. *Hart*, 963 F.2d at 1281-82; *Guzman*, 849 F.2d at 448-49; *McCall*, 592 F.2d at 1068; *Gaylor*, 426 F.2d at 235. As the Ninth Circuit emphasized in *Hart*, this result does not result in a windfall to the government.

The Court acknowledges that other circuits have recognized a limited exception to the rule applied in the Ninth Circuit. Under that exception, a district court may overturn a guilty verdict when there is "an internal inconsistency in the same count, as it relates to the same defendant, in the same verdict." *Randolph*, 794 F.3d at 611. *See also Pierce*, 940 F.3d at 822 ("Though the language from these [Supreme Court] opinions is broad, the Court's holdings do not resolve the precise issue we face here: irreconcilably inconsistent verdicts as to the same defendant on the same count of an indictment."). However, the Ninth Circuit has never recognized such an exception and the Court does not discern, from the unqualified language in *Hart*, *Guzman*, *McCall*, and *Gaylor*, an invitation to do so.[9]

Nevertheless, even if the deciphering exercise sought by Defendant were required here, Defendant would not be entitled to relief. Acknowledging the inherent difficulty (if

---

[9] During oral argument, defense counsel argued that *Guzman* can be construed as authorizing district courts in the Ninth Circuit to recognize exceptions to the general prohibition against reviewing jury verdicts for inconsistency. The Court respectfully disagrees. *Guzman* identified "*an* exception" to this rule, which is that a "conviction of one defendant and acquittal of the other when the only evidence of culpability applies equally to both may violate due process unless there is an articulation of a rational basis for dissimilar treatment." *Guzman*, 849 F.2d at 448 (citations omitted and emphasis added). But this phrasing suggests a singular exception (which is inapplicable here), not an open-ended invitation for district courts to find new factual scenarios in which to create more exceptions. In a related vein, the Court's research indicates that *Pierce*, *Randolph*, and *Shippley*, which identify additional exceptions to this general rule, have never been cited (much less cited with approval) by the Ninth Circuit.

not folly) of speculating about what occurred in the jury room, the chronology of the jury's questions in this case suggests that the jury began by addressing Count One, divided over which of the two lesser-included offenses of Count One (second-degree murder or involuntary manslaughter) was most appropriate, and ultimately agreed that involuntary manslaughter was the appropriate charge.  (Doc. 68 at 3-4 [first asking a question about the intent element for second-degree murder, then stating "The jury is split on a decision between 2 charges for Count 1.  What are our options?"].)  Next, the jury turned to Count Three, agreed that Defendant should be found guilty of assault with a dangerous weapon, and then developed confusion over whether any verdict was required as to the lesser-included offense of simple assault in light the guilty verdict as to the greater charge.  (*Id.* at 6 ["Are all blanks on verdict form to be considered, even if an answer is not required?  Ex. One charge <u>or</u> another (lesser) charge.  Is N/A applicable?"].)  Although the Court answered this question by explaining that the jury could simply leave the verdict form blank as to the lesser-included charge in that scenario (*id.* ["A blank need not be completed if an answer is not required."]), it's possible the jury misunderstood this explanation when it resumed its deliberations and felt that it needed to supply some answer as to simple assault before turning to Count Four.  This understanding is bolstered by how the jury proceeded when it turned to Count Four.  The jury instruction concerning Count Four made clear that the jury could only return a guilty verdict if it also found that "the defendant committed the crime of CIR-Assault with a Dangerous Weapon as charged in Count 3 of the indictment."  (Doc. 67 at 29.)  Thus, the jury's finding of guilt as to Count Four suggests that its finding of guilt as to the greater charge on Count Three was not some inadvertent mistake but a product of unanimous agreement after deliberation.[10]

These details—the fact that the alleged inconsistency involved guilty and not-guilty

---

[10]    Alternatively, another potential explanation is that the jury initially declined to fill out the blank for simple assault in light of the Court's answer to its final question, but then got confused about the propriety of leaving blanks on the verdict form after the Court sent back the initial verdict form (due to the failure to provide a verdict on Count Two) and belatedly provided a verdict for simple assault at that point.  But that scenario, like the other potential scenario provided in the text above, would not negate the inference that the jury intended to find Defendant guilty of assault with a dangerous weapon.

verdicts on greater and lesser-included offenses, the jury questions giving some insight into the jury's deliberative process, and the finding of guilt on a separate count that necessarily incorporated the challenged finding of guilt as to the greater count—distinguish this case from the out-of-circuit authorities on which Defendant relies. In those cases, the jury was provided with special interrogatories (in contrast to the general verdict form used here), made a finding of guilt when answering the initial question in relation to a drug count, but then made not-guilty findings (or the equivalent) in response to all of the resulting special interrogatory questions pertaining to drug type and quantity. *Pierce*, 940 F.3d at 821-22 (noting that "special interrogatories are generally disfavored in criminal cases," that "as this appeal illustrates, care must be taken in drafting interrogatories to minimize the risk of inconsistent verdicts," and that "inclusion of the interrogatories asking whether the jury found the conspiracy allegations as to each narcotic proven or not proven was not necessary"); *Randolph*, 794 F.3d at 610-12 (deviating from the general rule "that inconsistent verdicts in a criminal case generally are not reviewable" because "we are not dealing with inconsistent verdicts [and instead] have an internal inconsistency in the same count, as it relates to the same defendant, in the same verdict," and later applying the rule that "[w]here a jury's special verdict finding negates an essential element of the offense, the defendant must be acquitted"). *See also Shippley*, 690 F.3d at 1193 ("The jury returned a general verdict finding Mr. Shippley guilty of the conspiracy charge. But in response to the court's special interrogatories, the jury indicated that Mr. Shippley had not conspired to distribute any of the drugs listed in the indictment. In effect, the jury both convicted and acquitted Mr. Shippley of the charged conspiracy."). Defendant has not pointed to any case, from any court, holding that a defendant is entitled to an across-the-board acquittal when a jury returns a guilty verdict on a charged count but a not-guilty verdict on a lesser-included offense of the charged count.[11] In contrast, the one analogous case the Court was

---

[11]     *Stow v. Murashige*, 389 F.3d 880 (9th Cir. 2004), cited for the first time in Defendant's reply, is not such a case. There, a Hawaii jury found the defendant guilty of attempted first-degree murder but not guilty of the lesser-included offense of attempted second-degree murder. *Id.* at 884. On direct appeal, the defendant did not appear to seek reversal of the first-degree murder conviction on the basis of *inconsistency*—instead, the defendant sought reversal based on *insufficiency* of the evidence. *Id.* The Hawaii Supreme

able to find through its own research suggests that the guilty verdict should be upheld in this scenario. *Lovell v. Thorpe*, 849 F. App'x 754, 757-58 (10th Cir. 2021) ("Lovell fares no better with his second claim for habeas relief.  He argues that his first-degree manslaughter conviction should be vacated [because] the jury acquitted him of the lesser-included offense of negligent homicide . . . .  'There are sound reasons, however, not to concern ourselves with the consistency of jury verdicts in criminal cases.'  Though we can speculate why the jury found Lovell guilty of first-degree manslaughter and acquitted him of negligent homicide, we can't infer from the jury's acquittal the basis of its conviction. In instances of truly inconsistent verdicts, '[t]he most that can be said . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt.' What's more, as the district court noted, '[t]here is no federal constitutional right to a consistent verdict, as long as sufficient evidence supports a conviction.'  Here, Lovell was protected from any potential jury error by the state's and the district court's independent review of the sufficiency of the evidence.  Such a review requires asking 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'  Both the court of criminal appeals and the district court determined that the evidence in the record satisfied [this] standard.  We agree.").[12]

…

…

…

---

Court agreed with the defendant's insufficiency argument and reversed the first-degree murder conviction.  *Id.*  The narrow issue presented in *Stow* was whether the not-guilty verdict on the second-degree murder charge constituted a double jeopardy bar that precluded the state from retrying the defendant on that charge.  *Id.* at 888-89.  The Ninth Circuit's conclusion that double jeopardy applies in that circumstance says nothing about whether the guilty verdict on the first-degree murder charge could have been sustained if supported by sufficient evidence.

[12]    The Court also notes that *Lovell* is a Tenth Circuit decision, which suggests that the panel in that case did not view the outcome as inconsistent with *Shippley* (which is the Tenth Circuit case on which Defendant relies).

II.    Count One

    A.    **The Parties' Arguments**

In the second pending motion, Defendant moves to dismiss Count One.  (Doc. 110.) Defendant's primary argument is that he did not agree with his trial counsel's decision to request a lesser-included offense instruction on involuntary manslaughter.  (*Id.* at 3 ["[Defendant] wanted . . . an all or nothing defense.  In other words, [Defendant's] position was that he had not committed this homicide at all, and that the jury should decide the case on that basis, rather than have the opportunity to compromise on a lesser-included verdict.  Nonetheless, trial counsel requested that the jury be instructed on Involuntary Manslaughter."].)  Defendant argues that he was entitled to "have the final say" on whether to request a lesser-included offense instruction and that the Court erred by failing to inquire into whether he agreed with his counsel's request.  (*Id.* at 3-4.)  In Defendant's view, the decision whether to request a lesser-included offense instruction is analogous to the decision to plead guilty, and thus that decision should be subject to the same requirements created by Rule 11(b) of the Federal Rules of Criminal Procedure.  (*Id.* at 4-5.)  Defendant also notes that, according to a decision by the Arizona Supreme Court, *Matter of Wolfram*, 847 P.2d 94 (Ariz. 1993), and the commentary to the ABA's Criminal Justice Section Standards, a criminal defense attorney has an ethical duty to consult with the client before requesting a lesser-included offense instruction.  (*Id.*)  Alternatively, Defendant argues he is entitled to the dismissal of Count One because there was insufficient evidence to support the giving of an involuntary manslaughter instruction or a finding of guilt as to that crime.  (*Id.* at 5-7.)  On this point, Defendant essentially makes the argument that the government unsuccessfully made (and he opposed) during the charge conference—that, in light of the evidence showing that Smith was shot at close range, the only possible verdicts on Count One were first- or second-degree murder.  (*Id.*)

The government opposes Defendant's motion.  (Doc. 115.)  As an initial matter, the government disputes, as a factual matter, Defendant's contention that he opposed his counsel's request for a lesser-included offense instruction on involuntary manslaughter,

noting that Defendant "was present throughout the process of settling jury instructions" and "gave no indication, verbally or through gesture, that he objected to his then counsel's request.  As evinced by Defendant's conduct before the Court in waiving his right to testify, Defendant certainly knew he had the right to so." (*Id.* at 6.)  On the merits, the government argues that although the authorities cited by Defendant suggest that defense attorneys should consult with their clients before deciding whether to request a lesser-included offense instruction, the ultimate decision whether to make such a request is a tactical decision that belongs to counsel.  (*Id.* at 6-7.)  According to the government, the only decisions that the defendant must personally make are whether to plead guilty, whether to waive a jury, whether to testify, and whether to appeal.  (*Id.* at 7).  In contrast, the government argues that "[t]he decision whether to request a lesser included offense instruction is a tactical decision to be made by counsel and to be evaluated for reasonableness in a claim alleging ineffective assistance of counsel." (*Id.* at 7-9, citations omitted.)  Finally, turning to Defendant's alternative argument, the government argues that the Court properly gave the involuntary manslaughter conviction at defense counsel's request.  (*Id.* at 9-10.)

In reply, Defendant disputes the government's contention that his "on-the-record agreement that he chose to exercise his rights to remain silent and not testify" is proof that he agreed with his counsel's decision to request the involuntary manslaughter instruction, arguing that "the record is utterly silent as to [Defendant's] assent to or dissent from his attorney's request." (Doc. 117 at 2-3.)  Next, Defendant argues that, in light of the Arizona courts' determination that defense attorneys have an ethical duty to consult with their clients about whether to request lesser-included offense instructions, it follows that the ABA Standards give the ultimate decision on that issue to the defendant, not counsel.  (*Id.* at 3.)  Next, Defendant seeks to distinguish the cases cited in the government's response. (*Id.* at 3-4.)  Finally, Defendant renews his argument that the evidence was legally insufficient to support an involuntary manslaughter instruction or conviction.  (*Id.* at 4-6.)

…

### B.   **Discussion**

Defendant is mistaken in his contention that he, rather than his trial counsel, was entitled to decide whether to request a lesser-included offense instruction on involuntary manslaughter.  As the Supreme Court has explained, "[a]n attorney undoubtedly has a duty to consult with the client regarding important decisions, including questions of overarching defense strategy.  That obligation, however, does not require counsel to obtain the defendant's consent to every tactical decision.  But certain decisions regarding the exercise or waiver of basic trial rights are of such moment that they cannot be made for the defendant by a surrogate.  A defendant . . . has the ultimate authority to determine whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." *Florida v. Nixon*, 543 U.S. 175, 187 (2004) (cleaned up).

Conspicuously absent from this list of decisions that must be made personally by the defendant is the decision whether to request a lesser-included offense instruction.  As the Ninth Circuit and other courts have recognized, that decision is a tactical and strategic choice that belongs to counsel.  *See, e.g.*, *Woratzeck v. Ricketts*, 820 F.2d 1450, 1455 (9th Cir. 1987), *vacated on other grounds*, 486 U.S. 1051 (1988) (noting that the "decision not to request a lesser included offense instruction falls within the wide range of reasonable professional representation" because it implicates "trial strategy" and is a "tactical matter"); *United States v. Dingle*, 114 F.3d 307, 312-13 (D.C. Cir. 1997) ("[C]harging on a lesser included offense . . . is an issue best resolved, in our adversary system, by permitting counsel to decide on tactics.  In deciding whether to request such an instruction, defense counsel must make a strategic choice: giving the instruction may decrease the chance that the jury will convict for the greater offense, but it also may decrease the chance of an outright acquittal.") (cleaned up); *United States v. Cobb*, 558 F.2d 486, 489 n.5 (8th Cir. 1977) (noting "the tactical implications of giving or not giving a lesser included offense instruction").  Accordingly, and as many courts have further recognized, the defendant's personal consent to that choice is not required.  *See, e.g.*, *Chisholm v. Braun*, 2017 WL 11606777, *12 n.3 (D.N.D. 2017) ("[T]he decision of whether to knowingly

waive possible lesser-included offenses is a strategic decision to be left within counsel's discretion.  So whether Chisholm's counsel did or did not discuss the issue of possible lesser-included offenses is possibly of little consequence because accepted standards of attorney conduct may not have required as much."); *Revels v. United States*, 2016 WL 5799701, *4 (W.D. Wash. 2016) ("[T]he Government argues that the decision to offer a lesser included offense is a tactical decision that does not require the client's consent.  The Court agrees, at least to the extent that there is no binding precedent to the contrary. Moreover, offering a lesser included offense with a significantly reduced punishment does not seem to be a decision on the level of a defendant's important constitutional right, such as whether to plead or waive a jury.  Thus, trial counsel did not err by failing to consult on this issue."); *Arko v. People*, 183 P.3d 555, 558 (Colo. 2008) ("[T]he decision whether a lesser offense instruction should be requested is distinguishable from the decision to plead guilty.  When a defendant pleads guilty, he waives all rights attendant to a jury trial.  On the other hand, a defendant retains all of his trial rights when he requests that a jury consider a lesser offense instruction. . . .  [T]he decision to request a lesser offense instruction is strategic and tactical in nature, and is therefore reserved for defense counsel.").[13]

Defendant identifies no case holding otherwise.  *Wolfram*, which Defendant identified during oral argument as the best case supporting his position on this point, was not a criminal appeal (or even a criminal post-conviction proceeding) but an attorney's appeal from a decision of the Arizona Supreme Court Disciplinary Commission. 847 P.2d at 95.  In the underlying disciplinary proceeding, the commission concluded that the attorney had committed an array of professional misconduct, including violating the duties of competence, diligence, and communication while representing a criminal defendant in

---

[13]    More broadly, the Ninth Circuit has recognized that jury instructions do not implicate the sort of rights that require the defendant's personal consent.  *United States v. Perez*, 116 F.3d 840, 845 n.7 (9th Cir. 1997) (en banc) ("Not all rights are waivable. Whether a right is waivable; whether the defendant must participate personally in the waiver; whether certain procedures are required for waiver; and whether the defendant's choice must be particularly informed or voluntary, all depend on the right at stake.  In this case, we need not conduct an extended analysis concerning the waivability of jury instructions.  We have long held that jury instructions may be waived by a defendant's attorney.") (citations and internal quotation marks omitted).

a case involving the death of the client's child and failing to cooperate in the resolution of two unrelated bar complaints. *Id.* at 95-96. On appeal, although the Arizona Supreme Court happened to note that the client's conviction in the child-death case was overturned during a post-conviction relief proceeding, it did not suggest that the reason for this decision was the attorney's failure to obtain the client's consent before requesting a lesser-included offense instruction. *Id.* at 96-97 ("Through her public defender, [the client] alleged that the representation provided by Respondent was not only ineffective but 'wretched beyond all belief.' The trial judge, without holding an evidentiary hearing, granted the petition and ordered a new trial."). Moreover, in the portion of the decision concluding that the attorney violated "ER 1.4: Communication" by "not consulting with his client about the possibility of instructing on lesser included offenses," the Arizona Supreme Court clarified that "*[e]ven though the lawyer is responsible for the means chosen to pursue a client's objectives*, informing the client regarding the essentials of those means is still required." *Id.* at 101 (emphasis added). The italicized language is consistent with conclusions reached elsewhere in this order—although a criminal defense attorney may have an ethical duty to *consult* with the client before deciding to request a jury instruction on a lesser-included offense, the violation of which may expose the attorney to professional discipline, the ultimate decision whether to make the request is a tactical and strategic choice for which the client's affirmative *consent* is not required.

Alternatively, even if—contrary to the analysis above—the decision whether to request a lesser-included instruction could be considered analogous to the other sorts of decisions that require the defendant's personal consent, this is not the correct proceeding (and the record is not properly developed) to determine whether such consent was lacking. Although successor counsel asserts in Defendant's motion papers that Defendant disagreed with his trial counsel's decision to request the involuntary manslaughter instruction, there is no cognizable evidence of such disagreement. *Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589, 593 n.4 (9th Cir. 2002) ("[A]rguments and statements of counsel 'are not evidence . . . .'"). Nor has Defendant requested an evidentiary hearing.

And as the government notes in its motion papers, there are reasons to be skeptical of Defendant's claim—Defendant gave no indication during trial that he disagreed with his counsel's tactical choices and only belatedly raised an objection, though successor counsel, after the tactical choice pertaining to Count One did not generate the outcome he preferred.[14]

In other contexts, when a dispute arises about whether a defense attorney acted ineffectively by failing to adequately consult with the defendant about a particular matter and/or obtain the client's consent to a particular choice, that dispute is generally resolved via a habeas corpus proceeding during which the defendant waives the attorney-client privilege so that former counsel can also provide an account of the disputed communications. *Bittaker v. Woodford*, 331 F.3d 715, 716 (9th Cir. 2003) ("It has long been the rule in the federal courts that, where a habeas petitioner raises a claim of ineffective assistance of counsel, he waives the attorney-client privilege as to all communications with his allegedly ineffective lawyer."). As a general rule, such matters are not properly resolved via post-trial motions or during the defendant's direct appeal. *See, e.g.*, *United States v. Moreland*, 622 F.3d 1147, 1157 (9th Cir. 2010) ("As a general rule, we do not review challenges to the effectiveness of defense counsel on direct appeal. Rather, we prefer to review ineffective assistance of counsel claims in habeas corpus proceedings under 28 U.S.C. § 2255.") (cleaned up); *United States v. Pirro*, 104 F.3d 297, 299 (9th Cir. 1997) ("The customary procedure for challenging the effectiveness of defense counsel in a federal criminal trial is by collateral attack on the conviction under 28 U.S.C. § 2255. We have rejected the use of a Rule 33 motion for new trial . . . involving the ineffective assistance of counsel.") (citation and internal quotation marks omitted). This provides another reason why Defendant's post-trial motion challenging the involuntary manslaughter conviction must be denied.

---

[14]   The Court also notes that Defendant does not raise, in his other post-trial motion, any suggestion that he objected to his trial counsel's request for a lesser-included offense instruction on simple assault. Instead, Defendant seeks to rely on the verdict pertaining to that count as his basis for invalidating other guilty verdicts.

Finally, as for Defendant's alternative argument that there was insufficient evidence to support the involuntary manslaughter instruction (or sustain the guilty verdict), this argument fails for two independent reasons.  First, there was sufficient evidence from which a rational jury could find Defendant guilty of that charge.  The mere fact that the fatal shot occurred at close range does not, as the government incorrectly argued during the charge conference and Defendant incorrectly argues now, necessarily show that the shooting was intentional (as opposed to reckless).  During closing argument, defense counsel offered a plausible narrative, based on the trial evidence, that the shooting occurred accidentally during a struggle between Contreras and Defendant and that the close-range nature of the shot was explained by the cramped confines of the trailer.  This is not, of course, the account that Contreras and Rhoades provided, but they were particularly impeachable witnesses whose testimony the jury was entitled to believe only in part.  (Doc. 67 at 14 [jury instruction explaining that "[y]ou may believe everything a witness says, or part of it, or none of it"].)  Indeed, defense counsel developed evidence that Contreras was angry at Defendant just before the shooting, that Contreras had a penchant for violence, and that Rhoades's account of when the shot occurred in relation to the struggle between Contreras and Defendant was inconsistent.  Thus, although the jury easily could have found Defendant guilty of first-degree or second-degree murder, it also could have rationally found that Defendant engaged in the same actus reus but with a less-culpable mental state and, thus, was guilty of involuntary manslaughter.  *Cf. United States v. Anderson*, 201 F.3d 1145, 1150 (9th Cir. 2000) ("Even when the evidence is conflicting, if any construction of the evidence and testimony would rationally support a jury's conclusion that the killing was unintentional or accidental, an involuntary manslaughter instruction must be given. When the defendant maintains that the killing was unintentional, the instruction is necessary even when there is also testimony by others that the defendant stated his intention to kill the deceased.").

Second, and alternatively, even if there was some error in granting defense counsel's request for a jury instruction on involuntary manslaughter (and, as discussed above, there

was none),[15] Defendant is precluded under the invited-error doctrine from complaining about that error now. *United States v. Magdaleno*, 43 F.4th 1215, 1220 (9th Cir. 2022) ("For purposes of the invited error doctrine, a defendant invites error when he induces or causes the error. The paradigmatic example of inducing or causing error arises when the defendant himself proposes allegedly flawed jury instructions.") (cleaned up). This conclusion does not, as Defendant suggested during oral argument, contravene *United States v. Olano*, 507 U.S. 725 (1993). Although *Olano* may preclude a finding of invited error where a defendant requests a jury instruction that, unbeknownst to him, contains a legal error, *see, e.g.*, *Perez*, 116 F.3d at 845-46, here defense counsel made a tactical choice to request a model instruction whose legal accuracy is not disputed.

Accordingly,

**IT IS ORDERED** that Defendant's post-trial motions (Docs. 109, 110) are **denied**.

Dated this 10th day of April, 2023.

_____

Dominic W. Lanza
United States District Judge

---

[15] In fact, under *Anderson*, the Court may have been required to give an instruction on involuntary manslaughter even if Defendant's trial counsel had not requested one. *See also* 9th Cir. Model J. Inst. 16.4, comment ("The trial judge may be obligated to give an instruction on involuntary manslaughter in a murder case even when the defense does not offer the instruction."). This further undermines Defendant's suggestion that the jury could only be instructed on involuntary manslaughter if he personally consented to the instruction.